IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
UNITED STATES OF AMERICA    )
                            )
      v.                    )   CRIMINAL ACTION NO.
                            )      2:12cr188-MHT
CHARLES DEAN PARTIN         )         (WO)
```

OPINION AND ORDER

Defendant Charles Dean Partin is charged with transporting a minor across state lines for purposes of committing aggravated statutory rape in violation of 18 U.S.C. § 2423(a) and transporting a stolen motor vehicle across state lines in violation of 18 U.S.C. § 2312.  The court previously appointed a guardian ad litem to represent the interests of the minor who is the alleged victim of Partin's conduct.

This cause is now before the court on the guardian's motion for the minor to give testimony at Partin's trial from a place, other than the courtroom, through two-way closed-circuit television pursuant to 18 U.S.C. § 3509(b)(1).  Both Partin and the government oppose the motion.  Because, as explained below, the court has

concluded that the minor is able to testify in Partin's presence with reasonable accommodations to mitigate her fear and emotional trauma, the motion will be denied.


## I. Legal Standard

"In a proceeding involving an alleged offense against a child ... a guardian ad litem ... may apply for an order that the child's testimony be taken in a room outside the courtroom and be televised by 2-way closed circuit television."  18 U.S.C. § 3509(b)(1)(A).  "The court may order that the testimony of the child be taken by closed-circuit television as provided in subparagraph (A) if the court finds that the child is unable to testify in open court in the presence of the defendant" for one of four reasons.  18 U.S.C. § 3509(b)(1)(B).  Those reasons are: "(i) The child is unable to testify because of fear"; "(ii) There is a substantial likelihood, established by expert testimony, that the child would suffer emotional trauma from testifying";

"(iii) The child suffers a mental or other infirmity"; or

"(iv) Conduct by defendant or defense counsel causes the child to be unable to continue testifying." Id.

"The district court must support its ruling with specific findings on the record". United States v. Fee, 425 F. App'x 847, 848 (11th Cir. 2011) (citing 18 U.S.C. § 3509(b)(1)(C)).  While there is no binding precedent establishing the burden of proof for such a motion, the court finds that the moving party must establish the statutory requirements by a preponderance of the evidence.  See United States v. Carrier, 9 F.3d 867, 871 (10th Cir. 1993) (affirming district court decision which applied preponderance standard).

## II. Procedural and Factual History

The guardian filed the instant motion in June 2013. She asks the court to allow the minor, who is referred to by her initials A.L., to testify by closed-circuit video from a location other than the courtroom.  After some

3

delay, in part due to concerns about Partin's competency,
the court issued an order establishing the procedure for
the hearing on the guardian's motion.[1]  See United States
v. Partin, -- F. Supp. 2d --, 2013 WL 6477445 (M.D. Ala.
2013) (Thompson, J.).  An evidentiary hearing was held on
December 17, 2013.  At the hearing, the guardian
presented two witnesses: A.L. and her school counselor.

The court concluded that it needed additional expert
testimony to resolve the guardian's motion and appointed
Chris Newlin, Executive Director of the National
Children's Advocacy Center, as a neutral expert.  Newlin
prepared two reports regarding A.L.'s ability to testify
in Partin's presence.  See Reports (Doc. Nos. 207, 226).
A second evidentiary hearing was held on June 17, 2014.
Newlin was the only witness at that hearing.

Based on the testimony of A.L., her school counselor,
and Newlin, the court makes the following findings of

---

1. The court determined that Partin is competent.
See Opinion (Doc. No. 130).

4

fact by a preponderance of the evidence.[2]   A.L. is 17
years old.   Partin was her mother's common-law husband,
and a father figure to her.   They lived in Alabama.
There were six children total in their house, of whom
only A.L. and her brother were not Partin's biological
children.   A.L. was the oldest child, and, because her
mother would leave Partin with the children for days and
weeks at a time, A.L. was often in the position of
'co-parenting' the other children alongside Partin.

---

2. The counselor was presented as an expert witness
as to A.L.'s ability to testify, but the court is not
satisfied that she was properly qualified as an expert
witness.   See Fed. R. Evid. 702.   The counselor indicated
that she was merely repeating what A.L. had told her and
was not relying on any standards to determine with any
degree of scientific certainty whether any of A.L.'s
statements were true or accurate.   The court therefore
has not relied on the counselor's expert opinions in this
matter.   However, to the extent that the counselor
testified to background information about A.L., the court
has considered that testimony.

The court further notes that the preponderance
standard applied to the findings of fact in this motion
is different from the beyond-a-reasonable-doubt standard
that will be applied by the jury at trial.

The sexual contact between A.L. and Partin began when she was 15.  Partin withdrew A.L. from school and began home-schooling her.  A.L. eventually became pregnant, and paternity testing has indicated that Partin is the father.  A.L. has since given birth, and the child is approximately 18 months old.

On one occasion, when A.L. was 15, Partin's co-worker, Eric, raped A.L. while he was at their house. When A.L. told her mother and Partin about it, neither called the police.  When Partin later found out A.L. was pregnant, he told her to say that she had snuck out of the house and become pregnant with Eric's child.  She told others that story until the paternity test was performed.  She did so because she was afraid for her siblings.  She also did so because Partin had told her that, when she was 16, she and he would run away together and get married.

Eventually, A.L.'s mother signed over her parental rights to Partin, and Partin took A.L. to Tennessee.  Her

mother stayed with the other siblings. Law-enforcement officers encountered Partin and A.L. at a campsite in Tennessee. Under questioning, A.L. initially told the officers she was 18 years old as Partin had instructed. She later told them her true age. Although she and Partin were separated by the officers, Partin communicated with her by hand signals.

The officers arrested Partin, and A.L. was taken to a foster home. The next day, while she was at a social-services office and when no one else was nearby, Partin approached her. She had believed he was in jail. He threatened to take her siblings and her baby away.

Partin was able to get to A.L. again after she was placed in foster care in Alabama. Although they had not communicated since the encounter at the social-services office, Partin somehow found A.L. while she was attending a doctor's appointment at a hospital. Partin grabbed her and they ran downstairs to where her mother was waiting in a van. A.L. ran because he told her to do so. Partin

and her mother made her keep her head down and switched
to another van, which Partin said he had stolen.[3]  They
took back roads to a church where her mother's friends
were waiting with her siblings and food, which they
loaded into the van.

The family headed towards Mexico.  They stopped in
fields along the way, and A.L. slept with Partin on the
ground while her mother slept with the others inside the
van.  The sexual contact between A.L. and Partin
continued nearly every day during this period.  They
stole gas, and A.L. served as the lookout.  Because they
were pulled over by law-enforcement officers six times
during the trip towards Mexico, they decided to head back
to Kentucky or Ohio instead, where they had family and
friends.  They eventually arrived at Partin's
ex-girlfriend's house in Ohio.  That night, A.L. and
Partin had sexual contact while her mother and siblings

---

3. It appears that the government's charge of
transporting a stolen motor vehicle across state lines in
violation of 18 U.S.C. § 2312 relates to this van.

8

were in the room with them. The FBI arrived later that night and arrested Partin.

### III. Discussion

#### A. Constitutional and Statutory Requirements

The guardian's request to allow A.L. to testify by two-way closed-circuit video implicates both 18 U.S.C. § 3509(b)(1), which authorizes such testimony under certain circumstances, and the Confrontation Clause of the Sixth Amendment.

The Confrontation Clause provides that, "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. "This clause ... 'guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact.'" United States v. Yates, 438 F.3d 1307, 1312 (11th Cir. 2006) (en banc) (quoting Coy v. Iowa, 487 U.S. 1012, 1016 (1988)). But the right to face-to-face confrontation "is not absolute and may be

9

compromised under limited circumstances where 'considerations of public policy and necessities of the case' so dictate." <u>Yates</u>, 438 F.3d at 1312 (quoting <u>Maryland v. Craig</u>, 497 U.S. 836, 848 (1990)).

In <u>Craig</u>, the Supreme Court upheld a state procedure that permitted minors who were the alleged victims of abuse to testify by one-way closed-circuit video. The Court acknowledged the importance of face-to-face confrontation, noting that it could not "easily be dispensed with," and concluded that "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." <u>Craig</u>, 497 U.S. at 848.[4]

---

4. The subsequent decision in <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), dramatically changed Confrontation Clause jurisprudence in some respects, but the Eleventh Circuit has rejected the argument that <u>Crawford</u> altered the analysis set forth in <u>Craig</u> for video testimony. (continued...)

In considering the one-way video procedure before it in Craig, the Court easily concluded that "other elements of confrontation--oath, cross-examination, and observation of the witness' demeanor--adequately ensure[d]" reliability, id. at 851, and that "a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." Id. at 853. The critical question, then, was whether the video procedure was necessary to further the State's important interest in protecting the alleged victims.

The Supreme Court then set out the "case specific" findings of necessity required to permit such testimony under the Confrontation Clause on the basis of trauma to the alleged victim: "(1) the special procedure 'is necessary to protect the welfare of the particular child witness who seeks to testify'; (2) 'the child witness

---

4(...continued)
Yates, 438 F.3d at 1314 n.4.

would be traumatized, not by the courtroom generally, but by the presence of the defendant'; and (3) 'the emotional distress suffered by the child witness in the presence of the defendant is more than <u>de minimis</u>, <u>i.e.</u>, more than mere nervousness or excitement or some reluctance to testify.'" <u>United States v. Fee</u>, 425 F. App'x 847, 850 (11th Cir. 2011) (quoting <u>Craig</u>, 497 U.S. at 856). However, the Supreme Court was clear that it was not deciding "the minimum showing of emotional trauma required" for video testimony; rather, it merely found that, whatever that minimum showing was, it had to be more than <u>de minimis</u> harm. <u>Craig</u>, 497 U.S. at 856.

Congress enacted 18 U.S.C. § 3509(b)(1), which authorizes two-way closed-circuit testimony under certain circumstances, "[i]n direct response to <u>Craig</u>". <u>United States v. Moses</u>, 137 F.3d 894, 898 (6th Cir. 1998); <u>see also United States v. Farley</u>, 992 F.2d 1122, 1124 (10th Cir. 1993) ("Following the <u>Craig</u> decision, 18 U.S.C. § 3509 was promulgated, specifying the procedures to be

12

used in federal courts to allow a child victim to testify via closed circuit.").[5]

However, this court does not interpret § 3509(b)(1) as necessarily imposing the same requirements that Craig does.  Rather, Craig sets the constitutional 'floor': regardless of what the statute does or does not require, the court must make the findings set forth in Craig in order to permit video testimony.  See United States v. Garcia, 7 F.3d 885, 888 (9th Cir. 1993) (reading into the statute Craig's requirement that minor's fear be because of the defendant's presence in court).

Therefore, to the extent that the requirements of the statute differ from those of Craig, this court agrees with the Tenth Circuit Court of Appeals that the moving party under § 3509(b)(1) must satisfy the requirements of both.  See United States v. Carrier, 9 F.3d 867, 871 (10th Cir. 1993).  "Together, the statute and Craig

_____

5. While Craig itself addressed a statute authorizing one-way closed-circuit testimony, "Craig supplies the proper test for admissibility of two-way video conference testimony" as well.  Yates, 438 F.3d at 1313.

13

require a case-specific finding that closed circuit testimony is necessary for a child because the child would suffer more than <u>de minimis</u> fear or trauma, and in fact would be unable to testify because of such fear or trauma, brought on by the physical presence of the defendant." <u>Id</u>.

The key statutory language is that the minor be "unable to testify" in court because of one of the enumerated factors, including her fear or a substantial likelihood of emotional trauma. 18 U.S.C. § 3509(b)(1)(B). The court does not interpret "unable to testify" to mean only a physical impossibility. Instead, the court understands the statutory language to refer to either such physical impossibility <u>or</u> severe emotional harm. <u>Cf</u>. <u>Craig</u>, 497 U.S. at 840 n.1 (statute approved by Supreme Court required showing of serious emotional distress). For example, a child may be physically able to sit on the stand and answer questions, but may suffer deep and lasting emotional harm after giving such

14

testimony in the presence of the defendant.  The court understands a child in that position to be "unable to testify" for the purposes of the statute, particularly subsection (B)(ii) (addressing emotional trauma).

The court also notes that the statute does not offer clear guidance on how much "emotional trauma" is enough to justify video testimony under § 3509(b)(1)(B)(ii). "The Supreme Court in Craig declined to specify the amount of emotional distress required, holding only that it must be more than de minimis." Garcia, 7 F.3d at 888. However, whatever the constitutional floor may be with regard to the amount of trauma required to justify video testimony, the statute requires the minor to be unable to testify because of the likelihood of such trauma.  As discussed above, this court interprets the unable-to-testify requirement to contemplate the prospect of severe emotional harm.

This interpretation is in keeping with the testimony of the court-appointed expert in this case, who described

15

emotional trauma, not as a clear line dividing those who suffer it from those who do not, but as a continuum of harms.[6]  In other words, emotional trauma may range from slight anxiety and discomfort to extremely severe anxiety, fear, and pain that may be felt for years to come.  By permitting video testimony only when the minor is underline(unable to testify) because of the prospect of emotional trauma, the statute singles out only the more severe end of the spectrum as sufficient to outweigh the defendant's Confrontation Clause rights.

Finally, the court notes that, under subsection (ii), relating to emotional trauma, the statute requires a showing of a "substantial likelihood" that the minor will suffer such emotional trauma.  18 U.S.C. § 3509(b)(1)(B)(ii).  The trauma inquiry requires predictions about what the child will feel in the future.  No one, whether an expert or not, can predict such

_____

6. No party challenged Newlin's status as an expert witness in this case, and the court finds that he so qualifies under Fed. R. Evid. 702.

16

contingent future events with certainty.  The question appropriately posed by the statute is simply whether the anticipated trauma is not just <u>possible</u>, but substantially likely.


### B.  Application

The guardian makes two arguments in favor of closed-circuit testimony: that A.L. is unable to testify because of fear under 18 U.S.C. § 3509(b)(1)(B)(i) and that she is unable to testify because of a substantial likelihood of emotional trauma under 18 U.S.C. § 3509(b)(1)(B)(ii). Applying the standard articulated above to the facts of the instant case, the court concludes that, with appropriate accommodations, the minor, A.L., is able to testify.  However, the court may re-examine this finding during the course of trial if it appears A.L. is unable to testify.

17

### 1. Accommodations

A minor's ability to testify may depend on a variety of circumstances, and among those are the ways in which the court does or does not accommodate the minor's special needs.  Indeed, according to the court-appointed expert in this case, the relevant research literature indicates that preparation of minor witnesses for the experience of testifying, as well as a positive relationship with legal authorities, can help minors testify without harm or mitigate the impact on their well-being.

In this case, the court is committed to do all that it can to reduce A.L.'s fear and mitigate the danger of emotional trauma.  However, the court is limited in its ability to do so by a critically important countervailing principle:  that the court must do nothing in accommodating A.L. that would unfairly prejudice Partin's rights.  So, for example, the court must reject an initial suggestion by expert-witness Newlin that a screen

18

be placed between A.L. and Partin, blocking each one's view of the other.   Besides giving the jury a basis to conclude that the court believes the witness has something to fear from the defendant, it is also "difficult to imagine a more obvious or damaging violation of the defendant's right to a face-to-face encounter" than such a screen.   <u>Coy v. Iowa</u>, 487 U.S. 1012, 1020 (1988) (finding screen violated Confrontation Clause).

However, expert-witness Newlin made a number of other suggestions which the court believes are warranted.   As Newlin has recommended, the court will make the following accommodations:

- The courtroom and seating arrangements will be altered so that Partin is not in A.L.'s natural line of sight.   The Supreme Court has found that "[t]he Confrontation Clause does not ... compel the witness to fix his eyes upon the defendant", although if a witness "studiously look[s] elsewhere, ... the trier

of fact will draw its own conclusions." <u>Coy</u>, 487 U.S. at 1019.  In this case, the court will arrange to have the attorneys' lectern, which is ordinarily located in the center of the courtroom, moved next to the jury box, on the far side of the courtroom from where Partin will be seated.  This will allow A.L. to avoid looking at Partin if she so desires, and it will be the setup of the courtroom throughout the trial to avoid any unfairly prejudicial inferences by the jury.

- The court will arrange the timing and order of A.L.'s and Partin's entrances to the courtroom in order to ensure she is comfortable and avoid the possibility of their paths crossing.  For example, Newlin suggested that A.L. might be brought in first and allowed to get comfortable in the witness box, and then Partin could be brought in afterwards by a door far from the witness box. Regardless of the details,

all such arrangements will be undertaken outside the presence of the jury.

- A.L. will be made aware of security arrangements, including any physical restraints on Partin, so that she is not only safe in fact but also perceives herself to be safe.  In this case, the Marshal's Service has indicated that either a belt capable of delivering an electric shock or physical leg restraints may be used in a way that is not visible to the jury, and that A.L.'s knowledge of the restraints that are used will not itself pose any security risk.

- The court will arrange for frequent breaks during A.L.'s testimony.  Further, the court will establish a subtle signal, not conspicuous to the jury, by which A.L. can indicate to court personnel that she desires a break.

- The court agrees that A.L. should have a comfort item, such as a stress ball, with her on the stand if

she so desires.  Newlin also recommended a 'comfort person.'  The court is not sure what this term refers to, and therefore is not yet prepared to agree.

- It appears that A.L.'s foster mother, with whom she has an excellent relationship, and A.L.'s child were both scheduled to be away from home during the original trial date.  Newlin said that the research literature indicates that a lack of caregiver support negatively impacts the ability of minors to testify without harm.  He therefore recommended that the trial date be changed, if possible, explaining that having both A.L.'s foster mother and, perhaps most importantly, her child available during the trial would help mitigate her fear and trauma.  The court agrees and will continue the trial date by one week.

- Perhaps the most important suggestion was that the court could help put A.L. at ease by involving her in the process and informing her of exactly what to expect.  Accordingly, while the court has already

22

agreed with the broad recommendations made by Newlin and discussed above, the court will seek A.L.'s input regarding the specifics. For example, the court may allow A.L. to express a preference among the available personnel from the Marshal's office; she might feel more comfortable with a female Marshal or with particularly strong-looking Marshals. The court directs counsel for the government and Partin to work with the guardian to determine what accommodations are desired and appropriate. Once A.L.'s wishes are ascertained, the parties should arrange a conference call with the court to discuss accommodations. Any input from A.L. will, of course, be subject to the court and Marshal's office making the final decisions.

With this understanding of the steps the court intends to take to mitigate A.L.'s fear and the chance of her suffering emotional trauma, the court therefore turns

to the question of whether she is, nonetheless, unable to testify in open court because of Partin's presence.

## 2. Fear

It is clear that A.L. is afraid of Partin and that she has good reason to fear him.  The evidence presented indicates that Partin manipulated A.L. from a position of trust and authority, not only initiating a sexual relationship but also arranging for total control over A.L. by withdrawing her from school, obtaining parental rights over her from her mother, and taking her out of state.  But it appears that events subsequent to Partin's initial arrest at the campsite loom even larger in A.L.'s mind.  Partin was able to reach her after his initial arrest twice: once at the social-services office in Tennessee and again at the hospital in Alabama.  On both occasions, she thought he did not know her whereabouts, and in at least the first instance she thought he was in police custody.  According to both A.L. and Newlin, these

incidents have left her with a very real fear that Partin may somehow escape and reach her again, or may threaten her child.  Although she recognizes that such an occurrence may be very unlikely, she nonetheless is afraid of Partin.

However, with the court's accommodations, she is not unable to testify on account of that fear.  A.L. testified that she had 'frozen up' on several occasions during the events surrounding this case: when the officers came to the campsite in Tennessee, when Partin approached her at the social-services office in Tennessee and at the hospital in Alabama, and when the FBI came in Ohio.  She described this 'freezing up' as lasting a matter of minutes.  Newlin suggested that, if A.L. were to 'shut down' in this manner during trial, then the court could take a recess so she could gather herself.  However, with appropriate accommodations, he was of the opinion that she would be able to testify in the Partin's presence.

The court agrees.  Having heard the testimony and observed A.L., the court is of the opinion that she is a resilient young woman who has exhibited an impressive ability to handle what is an extremely difficult situation.  Newlin testified that, in his opinion, A.L. had in some ways experienced far more than the typical 17-year-old, including giving birth.  At the same time, she has had less preparation for structured environments, like a courtroom, than a typical 17-year old.  Despite her resiliency, and perhaps aggravated by her lack of exposure to structured environments, the court has no doubt that the experience of testifying in court before a jury and possibly spectators will be frightening for A.L.  Such testimony would be frightening for any minor, and indeed is frightening for nearly every witness the first time he or she takes the stand.  But the court is simply not convinced that, with the accommodations discussed above, A.L. will be unable to testify because

of that fear.[7]   Furthermore, the court is even less
convinced that she will be unable to testify because of
fear specifically attributable to Partin's presence in
the courtroom.  Rather, the court finds that A.L. will be
able  to  testify  with  appropriate  accommodations,
discussed above.  The court need not and does not reach
the question of whether she would be unable to testify
without those accommodations.

---

7. Indeed, the testimony in this case indicates that
A.L. expects to be called as a witness in future cases,
and that she is substantially _more_ afraid of testifying
in those future cases than she is of testifying in this
case.  The difference, apparently, is that A.L. feels the
paternity test, establishing Partin as the father of her
child, is essentially undisputable, and so makes her
credibility as a witness less critical in this case.  By
contrast, apparently there is no correspondingly strong
physical evidence to corroborate her account in those
other cases.  Newlin said that the research literature
indicates that the lack of such corroborative evidence
can make testimony more challenging for minors, and the
corollary is that the presence of strong corroboration in
this case will make A.L.'s testimony less challenging.
Newlin also said that requiring minors to testify in
multiple cases (or on multiple occasions) also negatively
impacts them; unfortunately, the court can do nothing to
spare A.L. from the need to testify in multiple cases.

### 3.   Emotional Trauma

Similarly, the court is convinced, based on Newlin's expert testimony, that there is a substantial likelihood A.L. will suffer some degree of emotional trauma.  As Newlin noted, the best predictor of future behavior is past behavior, and A.L. suffered from recurring thoughts and nightmares following her testimony before this court during the first evidentiary hearing on the guardian's motion.  She needed an increase in the frequency of her therapy sessions following that testimony.  The court is satisfied based on the expert evidence presented, that A.L. will not, as Newlin put it, come out of the experience of testifying "unscathed".[8]

However, once again, the court is not satisfied that, with appropriate accommodations, A.L. will be unable to testify because of trauma due to Partin's presence.  As

_____

8. On cross examination, Newlin testified that he could not say there was a substantial likelihood A.L. would suffer emotional trauma from testifying. Regardless, the court finds such a likelihood based on Newlin's testimony.

discussed above, the statute, as the court interprets it, requires a severe level of expected trauma in order to establish that the minor is unable to testify, and in this case the expert testimony established that, with appropriate accommodations, the anticipated trauma is insufficient to meet that standard.  This is not to diminish the effect testimony may well have on A.L. Again, testimony is difficult and painful for nearly all children, not to mention many adults, and even more so when the subject of that testimony is as sensitive and painful as A.L.'s will doubtless be.  The court is quite sympathetic to A.L. and other minor witnesses in similar positions.[9]

------------------------------------------------------------

9. The court notes that A.L.'s age appears to cut in different directions.  On the one hand, the court has observed her maturity and resiliency, likely due in part to the fact that she is 17 years old rather than, for example, 12 or 5.  On the other hand, Newlin testified that the research literature indicates that older children actually suffer more negative impacts from testimony than do younger children because they can better understand the process.  It may be that older children, like A.L., are less likely to be unable to testify because of fear, but more likely to suffer severe
(continued...)

But, again, under <u>Craig</u> the relevant emotional trauma must be <u>because of</u> Partin's presence in the courtroom, not other factors.  Newlin indicated that A.L. was "quite anxious about being around Mr. Partin, <u>whether it is in the same courtroom or if she were to testify via [closed-circuit] TV</u> with his image on a screen," Report (Doc. No. 207) at 3 (emphasis added), and the court notes that during her prior testimony, from which she did suffer some trauma, Partin was <u>not</u> in the room but rather connected by closed-circuit video.  In other words, the record in this case indicates that A.L. will suffer some trauma from testifying, regardless of whether that testimony is in person or by video.  The court cannot spare her the pain of testifying in general, and the record simply does not support the argument that, even with the accommodations discussed above, she is likely to suffer severe <u>additional</u> trauma because of Partin's presence.  Thus, again, the court finds that A.L. will be

---

9(...continued)
emotional harm sufficient to justify video testimony.

able to testify with appropriate accommodations, and again does not reach the question of whether the same would be true without such accommodations.

### 4. Events During Trial

Despite the court's findings and accommodations, events during the trial may lead the court to re-examine its conclusion that A.L. is able to testify. In particular, the court anticipates two possible scenarios in which it could become clear that A.L. is unable to testify: first, she may simply be unable to proceed, either physically or emotionally; and, second, Partin may take some action that leaves her unable to proceed.

Notwithstanding the court's findings and predictions at this stage, the court will make arrangements for video-conferencing to be available. If A.L. is or becomes unable to testify for one of the statutory reasons during the course of the trial, then the court may allow her to continue her testimony by video. As

31

discussed above, if A.L. merely 'freezes up,' but is able to recover shortly thereafter, that would not be sufficient to justify transferring to video testimony. However, if she cannot recover and continue in Partin's presence, then video testimony may become necessary.[10]

A quite different scenario would be presented if Partin takes some action that, directly or indirectly, leaves A.L. unable to testify in his presence. For example, A.L. testified that Partin tried to communicate with her using hand signals when the police first arrived at the campsite in Tennessee and that she is afraid he will try to do so during the trial. In that instance, the court would have substantially more leeway to address the problem. For example, the court can make findings on the record that the fault lies with Partin, and take

---

10. The parties should be prepared to discuss what to tell the jury in this eventuality. One possibility would to explain that A.L. simply had a case of 'stage fright,' which jurors themselves often experience. This might mitigate the chance of a jury drawing the inference that the court believes that A.L. has something to fear from the defendant.

appropriate action.   Cf. Illinois v. Allen, 397 U.S. 337 (1970) (permitting defendant to be removed from trial because of disruptive conduct).   Indeed, the statute specifically contemplates video testimony when "[c]onduct by defendant or defense counsel causes the child to be unable to continue testifying."   18 U.S.C. § 3509(b)(1)(B)(iv).

\*\*\*

The guardian's motion presents the court with a difficult dilemma.   The court has a strong interest in protecting the minor from harm, and yet Partin has rights which must be respected.   Under the circumstances of this case, the court is convinced that the proper balance of these two weighty interests lies in providing Partin with the right to an in-person confrontation, but taking all reasonable steps to mitigate the harm to the minor, consistent with Partin's rights.

Accordingly, it is ORDERED that:

33

(1)  The  guardian  ad  litem's  motion  for  two-way closed-circuit  television  testimony  at  trial  (Doc.  No. 127)  is  denied  on  the  assumption  that  the  conditions  set forth  in  this  opinion  are  satisfied.

(2)  The  parties  shall  meet  and  confer  to  discuss what  reasonable  accommodations  can  be  taken  to  mitigate the  minor's  fear  and  emotional  trauma,  consistent  with the  rights  of  defendant  Charles  Dean  Partin.    The guardian  shall  ascertain  the  minor's  views  on  the subject.    The  parties  shall  then  arrange  a  telephone conference  with  the  court  to  discuss  accommodations.

DONE,  this  the  23rd  day  of  June,  2014.


                    /s/ Myron H. Thompson
                  UNITED STATES DISTRICT JUDGE